**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **GARY A. MULLINS,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:14cv00010** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

*I.  Background and Standard of Review*

Plaintiff, Gary A. Mullins, ("Mullins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed an application for DIB on April 21, 2011, alleging disability as of March 29, 2011, due to rheumatoid arthritis, depression, fatigue, weakness, constantly having to change positions from sitting to standing, pain in the bottoms of his feet, pain in his hands, loss of grip strength and trouble with his knees. (Record, ("R."), at 172, 175-76, 186, 193.) The claim was denied initially and on reconsideration. (R. at 93-95, 103, 104-06, 108-10.) Mullins then requested a hearing before an administrative law judge, ("ALJ"), (R. at 111), and a hearing was held on October 30, 2012, at which Mullins was represented by counsel. (R. at 31-72.)

By decision dated November 19, 2012, the ALJ denied Mullins's claim. (R. at 13-25.) The ALJ found that Mullins met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 15.) The ALJ also found that Mullins had not engaged in substantial gainful activity since March 29, 2011, his alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that Mullins suffered from severe impairments, namely rheumatoid arthritis and degenerative joint disease of the knees, but he

-2-

found that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ found that Mullins had the residual functional capacity to perform light work,[1] which did not require more than occasional fingering of objects, climbing of ramps and stairs, kneeling, crouching and stooping/bending, that did not require more than frequent balancing and that did not require him to operate foot controls, crawl, climb ladders, ropes or scaffolds or to work around concentrated exposure to temperature extremes and work hazards. (R. at 17.) The ALJ found that Mullins was unable to perform any of his past relevant work. (R. at 24.) Based on Mullins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mullins could perform, including jobs as an arcade attendant, a cafeteria attendant and a self-service storage sales attendant. (R. at 24-25.) Thus, the ALJ found that Mullins was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2014).

After the ALJ issued his decision, Mullins pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 1-6.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Mullins's motions for summary judgment

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2014).

filed August 11, 2014, and October 27, 2014, and the Commissioner's motion for summary judgment filed September 15, 2014.

## II. Facts

Mullins was born in 1960, (R. at 175), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). He has a high school education and past relevant work experience as an auto body technician. (R. at 187.)

Mullins testified at his hearing that he was laid off from work after his place of employment closed. (R. at 40.) He stated that he received unemployment benefits following his layoff. (R. at 40.) Mullins stated that he sought employment as an auto body repair worker because that type of work is all he knew how to perform. (R. at 40.) When asked why he could not work, Mullins testified that his knees had "really been bothering" him for the past three months and that his right elbow and hands had been bothering him, as well. (R. at 45-46.) He also testified that his back had been hurting him. (R. at 46.) Mullins stated that his doctor was not "doing anything" to treat his back pain. (R. at 47.) He stated that his doctor gave him a prescription for Elavil for anxiety and depression, but did not refer him for counseling. (R. at 48.)

When questioned about the frequency of flare-ups with his hands given the fact that his doctors' reports did not show anything really wrong with his hands, Mullins stated that his flare-ups occurred two-to-three times a month. (R. at 49-50.)

-4-

Mullins testified that he had problems with the bottoms of his feet and his hips. (R. at 50.) He stated that he had talked to Dr. Zang about prescribing an assistive device, but he was given injections in his knees instead. (R. at 50-51.) He acknowledged, however, that his last injection had been in the winter of 2011. (R. at 51.) The ALJ offered to send Mullins for a consultative examination for his alleged knee problems, but Mullins's attorney opted to develop his allegations through his hearing testimony. (R. at 53.)

Mark Hileman, a vocational expert, also was present and testified at Mullins's hearing. (R. at 64-68, 70-71.) Hileman classified Mullins's past work as an auto body repairman as medium[2] and skilled; however, he noted that Mullins indicated that he performed it at the heavy[3] exertion level. (R. at 65.) Hileman was asked to consider a hypothetical individual of Mullins's age, education and work history, who had the residual functional capacity to perform light work that did not require more than occasional use of his upper extremities for fingering or fine manipulation, climbing ramps and stairs, kneeling, crouching, stooping and bending, that required no more than frequent balancing and never required the use of his lower extremities to push and/or pull, to operate foot controls, to climb ladders, ropes or scaffolds, to crawl and to work around concentrated exposure to

_____

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2014).

[3] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2014).

-5-

extreme heat and cold. (R. at 65-66.) Hileman stated that a significant number of jobs existed that such an individual could perform, including jobs as an arcade attendant, a cafeteria attendant and a self-service store sales attendant. (R. at 66.) Hileman stated that all jobs would be precluded should the individual miss more than two days of work per month. (R. at 68.)

In rendering his decision, the ALJ reviewed medical records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Thomas M. Phillips, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Indian Path Medical Center; Arthritis Associates of Kingsport; Dr. Charles W. Tyhurst, O.D.; Dr. Michael W. Bible, M.D., a rheumatologist; Dr. Alton J. Morris, M.D., a rheumatologist; Dr. Jeffry D. Bieber, M.D., a rheumatologist; and Dr. Song Zang, M.D., a rheumatologist.

The record shows that Mullins began treating with Dr. Alton J. Morris, M.D., at Arthritis Associates of Kingsport, in 1990. (R. at 276.) An August 2008 progress note indicates that Mullins previously had been diagnosed with seropositive rheumatoid arthritis. (R. at 276.) On August 25, 2008, Mullins saw Dr. Jeffry D. Bieber, M.D., a rheumatologist, for flares of pain in his wrists, knees and shoulders. (R. at 276.) He denied swelling in his joints, but complained of experiencing up to three hours of morning stiffness. (R. at 276.) Dr. Bieber diagnosed arthralgias, distribution most consistent with osteoarthritis. (R. at 276.) On October 14, 2008, Mullins complained of pain in his hands, feet and knees, as

-6-

well as swelling in his hands and knees. (R. at 277.) Mullins stated that he was stiff all day and that he was having trouble going to work because of the pain. (R. at 277.) Examination revealed no synovitis in the upper extremities. (R. at 277.) He was tender over the elbows, and there was minimal swelling of the knees. (R. at 277.) Dr. Bieber diagnosed osteoarthritis. (R. at 277.)

On October 15, 2008, Dr. Michael W. Bible, M.D., a rheumatologist, saw Mullins for evaluation of right knee pain. (R. at 353-54.) Mullins reported stiffness and swelling in his hands, but his most bothersome pain was in his right knee. (R. at 354.) Examination revealed good muscle strength in the upper and lower extremities and normal sensation to pinprick to the medial and ulnar nerves of the hands and lower extremities. (R. at 354.) Mullins had significant tenderness in the patella-femoral joint. (R. at 354.) Dr. Bible diagnosed past history of rheumatoid arthritis, not evident on examination and patella-femoral joint disease. (R. at 354.) On November 14, 2008, Dr. Bible noted a definite change in Mullins's examination after Mullins's prescription for prednisone had been decreased. (R. at 358.) Mullins reported a lot of stiffness and soreness in his hands. (R. at 358.) Dr. Bible diagnosed rheumatoid arthritis and prescribed methotrexate. (R. at 358.) On December 12, 2008, Mullins reported that he was doing better. (R. at 359.)

On February 13, 2009, Dr. Bible noted that Mullins was doing pretty well, and he had no pain, swelling or stiffness. (R. at 363.) On May 22, 2009, Mullins reported pain in his ankles and more discomfort in his hands. (R. at 367.) Examination revealed a trace of swelling and tenderness in the

-7-

metacarpophalangeal, ("MCP"), joints of both hands, and no swelling or tenderness in the wrists or proximal interphalangeal, ("PIP"), joints. (R. at 367.) Mullins had "pretty good" range of motion in his shoulders, there was no inflammation of the knees, and there was trace swelling and tenderness in the ankles. (R. at 367.) X-rays of Mullins's feet revealed normal MTP joints with no erosions and a little osteoarthritis of the great toes. (R. at 368.) The PIP and distal joints to the toes looked "pretty good," with no erosions, and there was a little thinning of the cortex of the fifth medial metatarsal head. (R. at 368.) X-rays of Mullins's hands revealed the wrists to have good carpal joint space with no erosion of the ulnar styloid and that the MCP joints appeared to have good joint space. (R. at 368.) Dr. Bible noted that there may be a slight joint space narrowing of the left third and fourth MCP, but could identify no erosions in the MCP joints. (R. at 368.) Dr. Bible also noted that the PIP joints had good joint space, with no definite erosions. (R. at 368.)

On July 1, 2009, Dr. Bible noted that Mullins's rheumatoid arthritis was "borderline controlled." (R. at 371.) Mullins had only a trace of swelling, if any at all, and no tenderness in his MCP and PIP joints. (R. at 371.)  Dr. Bible informed Mullins that he would be closing his practice on December 30, 2009. (R. at 376.)

On April 22, 2009, Dr. Charles W. Tyhurst, O.D., examined Mullins upon referral from Dr. Bible to rule out adverse ophthalmic effects from Plaquenil therapy. (R. at 348.) Mullins reported no visual complaints. (R. at 348.) Examination showed no signs of ocular toxicity from Plaquenil. (R. at 348.)

-8-

The record shows that Mullins was treated by Dr. Song Zang, M.D., a rheumatologist associated with Holston Medical Group, from January 2010 through August 2012. (R. at 382-421, 425-26, 449-54, 459-60, 462-67, 469-70, 482-86, 491-92, 494-97.) On January 27, 2010, Mullins was seen as a new patient upon referral from Dr. Bible. (R. at 416-17.) Mullins complained of muscle and joint pain. (R. at 416.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 417.) Dr. Zang noted that Mullins had no active swelling in his joints, and his joints had normal range of motion. (R. at 417.) X-rays of Mullins's knees showed arthritic abnormalities of both knees, right greater than the left. (R. at 409.) On April 30, 2010, Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 405.) Dr. Zang noted that Mullins had no active swelling in his joints, and his joints had normal range of motion. (R. at 405.) Dr. Zang noted that Mullins's rheumatoid arthritis was stable. (R. at 405.) On July 30, 2010, Mullins complained of pain in his fingers and hips. (R. at 398.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 399.) Dr. Zang noted that Mullins had no active swelling in his joints, and his joints had normal range of motion. (R. at 399.) Dr. Zang noted that Mullins's rheumatoid arthritis was stable. (R. at 399.) On November 30, 2010, Mullins reported significant pain and stiffness in his hands in the morning hours. (R. at 394.) Dr. Zang reported that Mullins had normal

strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 395.)

On March 29, 2011, Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 387.) On July 7, 2011, Mullins complained of bilateral elbow, hand, feet and right knee pain. (R. at 410.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 411.) Dr. Zang noted that Mullins had tenderness to palpation in multiple small joints in his hands bilaterally. (R. at 410.) On October 10, 2011, Mullins complained of bilateral hand, shoulder, feet and right knee pain. (R. at 451.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 452.) Dr. Zang noted that Mullins had limited range of motion of the right shoulder. (R. at 452.) Dr. Zang noted that Mullins's rheumatoid arthritis was very active and that his shoulder pain was likely do to tendonitis/bursitis. (R. at 453.) On January 12, 2012, Mullins complained of bilateral feet pain and left hand pain. (R. at 459.) On April 12, 2012, Mullins complained of left wrist pain, left knee pain and right elbow pain. (R. at 462.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at

-10-

463.) Dr. Zang noted no active swelling in Mullins's joints, and his joints had normal range of motion. (R. at 463.) On August 13, 2012, Mullins complained of back pain. (R. at 491, 495.) Mullins also requested medication for increased anxiety and depression. (R. at 491, 495.) Dr. Zang reported that Mullins had normal strength in both upper and lower extremities bilaterally, normal deep tendon reflexes in both the upper and lower extremities and normal stance and gait. (R. at 496.) Dr. Zang noted no active swelling in Mullins's joints, and his joints had normal range of motion. (R. at 496.) Dr. Zang diagnosed depression with anxiety. (R. at 496.)

On June 15, 2011, Dr. Thomas M. Phillips, M.D., a state agency physician, opined that Mullins had the residual functional capacity to perform light work. (R. at 77-79.) He found that Mullins could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; frequently balance; and never climb ladders, ropes or scaffolds. (R. at 77.) Dr. Phillips opined that Mullins's ability to finger for fine manipulation was limited. (R. at 78.) Mullins had no visual or communicative limitations. (R. at 78.) Dr. Phillips opined that Mullins should avoid concentrated exposure to extreme heat and cold and working hazards, such as machinery and heights. (R. at 78.)

On June 21, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, opined that Mullins did not have a mental diagnosis, and he was not, at that time, on medication. (R. at 75.)

-11-

On September 22, 2011, Dr. Michael Hartman, M.D., a state agency physician, opined that Mullins had the residual functional capacity to perform light work. (R. at 88-90.) He found that Mullins could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; frequently balance; and never climb ladders, ropes or scaffolds. (R. at 89.) Dr. Hartman opined that Mullins's ability to finger for fine manipulation was limited. (R. at 89.) Mullins had no visual or communicative limitations. (R. at 90.) Dr. Hartman opined that Mullins should avoid concentrated exposure to extreme heat and cold and working hazards, such as machinery and heights. (R. at 90.)

On September 26, 2011, Richard J. Milan, Jr., Ph.D., a state agency psychologist, opined that Mullins did not have a mental diagnosis, and he was not, at that time, on medication. (R. at 87.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds

-12-

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Mullins argues that the ALJ failed to conduct a full and fair hearing due to

-13-

his bias towards him. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-9.) Mullins argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief at 9-19.) In particular, Mullins argues that the ALJ erred by failing to find that his impairment met or equaled the listing for inflammatory arthritis found at 20 C.F.R. Part 404, Subpart P, § 14.09. (Plaintiff's Brief at 9-19.) Mullins also argues that the ALJ erred by failing to properly consider his allegations of pain. (Plaintiff's Brief at 14-18.)

Mullins first argues that the ALJ failed to conduct a full and fair hearing due to his bias towards him. (Plaintiff's Brief at 3-9.) I find this argument unpersuasive. An ALJ is presumed to be unbiased unless there is a showing of conflict of interest or some other specific reason for disqualification. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982). The burden of the establishing a disqualifying interest rests with the party asserting bias. *See Schweiker*, 456 U.S. at 196. The party asserting bias must show that the behavior of the ALJ was "so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). Facts introduced or events occurring in the current proceedings do not constitute a basis for bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

Despite Mullins's allegations of bias, a review of the record shows that the ALJ's conduct did not meet this standard. Mullins has failed to meet his burden of showing that the behavior of the ALJ "was so extreme as to display clear inability

-14-

to render fair judgment." *Liteky*, 510 U.S. at 551. Nor do the facts of this case show a "deep-seated antagonism" on the part of the ALJ that would "make fair judgment impossible." *Liteky*, 510 U.S. at 555. Given the fact that the record contained no opinions from treating or examining physicians that Mullins had work-related functional limitations that would support a finding of disability, the ALJ offered to send Mullins for a consultative examination in order to further develop the record. (R. at 53.) The ALJ's offer to send Mullins for a consultative examination does not support any allegation that the ALJ was biased toward Mullins and failed to provide him with a full and fair hearing.

Furthermore, a review of the hearing transcript indicates that the ALJ treated Mullins courteously, respectfully and fairly and offered counsel the opportunity to fully question Mullins and the vocational expert. (R. at 53-63, 68-72.) The ALJ made every effort to explain the hearing process to Mullins, and he informed Mullins that he was not bound by the prior determinations that he was not disabled, and that it was his job to conduct the hearing, take testimony, review the evidence and make a new and independent determination of his claim. (R. at 33.) There is no evidence of bias in this case, and the ALJ's effort to develop the record by thoroughly questioning the witness does not constitute bias. As the finder of fact, the ALJ was entitled to question Mullins and the vocational expert concerning all aspects of the case. *See* 20 C.F.R. § 404.944 (2014) (requiring the ALJ to look fully into the issues, and question the claimant and other witnesses). Based on this, I find that the ALJ conducted a full and fair hearing and did not show any bias toward Mullins.

-15-

Mullins next argues that the ALJ erred by failing to find that his impairment met or equaled the listing for inflammatory arthritis found at 20 C.F.R. Part 404, Subpart P, § 14.09. (Plaintiff's Brief at 9-19.) Section 14.09 requires that the disorder result in:

A. Persistent inflammation or persistent deformity of:
  1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively; or
  2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively.

or

B. Inflammation or deformity in one or more major peripheral joints with:
  1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
  2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

C. Ankylosing spondylitis or other spondyloarthropathies, with:
  1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or
  2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.

-16-

or

    D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, § 14.09 (2014).

For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, Mullins's impairment(s) do not meet or equal § 14.09 because the record contains no evidence to support such a finding.

Dr. Bible's records indicate that Mullins was doing well, and he had no pain, swelling or stiffness. (R. at 363.) Examination revealed a trace of swelling and tenderness in the MCP joints of both hands, and no swelling or tenderness in the wrists or proximal PIP joints. (R. at 367.) Mullins had "pretty good" range of motion in his shoulders, there was no inflammation of the knees, and there was trace swelling and tenderness in the ankles. (R. at 367.) X-rays of Mullins's feet revealed normal MTP joints with no erosions and a little osteoarthritis of the great toes. (R. at 368.) The PIP and distal joints to the toes looked "pretty good," with no

-17-

erosions and there was a little thinning of the cortex of the fifth medial metatarsal head. (R. at 368.) X-rays of Mullins's hands revealed the wrists to have good carpal joint space with no erosion of the ulnar styloid and that the MCP joints appeared to have good joint space. (R. at 368.) Dr. Bible noted that there may be a slight joint space narrowing of the left third and fourth MCP, but he could identify no erosions in the MCP joints. (R. at 368.) Dr. Bible also noted that the PIP joints had good joint space, with no definite erosions. (R. at 368.) On July 31, 2009, Dr. Bible noted that Mullins was "doing very well." (R. at 373.) Mullins had no pain, swelling or stiffness. (R. at 373.) Dr. Bible reported that Mullins's rheumatoid arthritis had a good response to treatment. (R. at 373.) On November 6, 2009, Dr. Bible noted that Mullins was doing well except for knee pain. (R. at 376.) A physical examination revealed no swelling, tenderness or erythema in the MCP and PIP joints, wrists, shoulders or elbows and no inflammation in the ankles or feet. (R. at 376.) Dr. Bible diagnosed rheumatoid arthritis, with a good response to treatment, and bilateral anserine bursitis. (R. at 376.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Dr. Zang's clinical findings repeatedly included normal muscle strength, normal deep tendon reflexes, normal stance and normal gait. (R. at 387, 395, 399, 405, 411, 417, 452, 463, 496.) Mullins had no active swelling in his joints, and his joints had normal range of motion. (R. at 387, 395, 399, 405, 417, 463, 496.) Dr. Zang reported that Mullins's rheumatoid arthritis was stable. (R. at 399, 405.) In addition, the record does not show that Mullins suffered from repeated

-18-

manifestations of inflammatory arthritis with at least two of the constitutional symptoms or signs of severe fatigue, fever, malaise or involuntary weight loss. (R. at 386, 394, 398, 404, 410, 412, 414, 416, 418, 420, 451, 462, 495.) Furthermore, none of Mullins's doctors placed limitations on his work-related abilities.

Based on my review of the record, there is no objective medical evidence showing that Mullins's impairment meets or equals § 14.09. Thus, substantial evidence supports the ALJ's failure to find that Mullins's impairments meet or equal § 14.09.

Mullins also argues that the ALJ erred by failing to consider his allegations of pain. (Plaintiff's Brief at 14-18.) I find that the ALJ considered Mullins's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

-19-

> Although a claimant's allegations about [his] pain may not be
> discredited solely because they are not substantiated by objective
> evidence of the pain itself or its severity, they need not be accepted to
> the extent they are inconsistent with the available evidence, including
> objective evidence of the underlying impairment, and the extent to
> which that impairment can reasonably be expected to cause the pain
> the claimant alleges [he] suffers....

76 F.3d at 595.

The ALJ noted that the lack of objective evidence and clinical findings in the record were out of proportion to Mullins's subjective complaints and did not support a conclusion that the limitations were of an intensity, frequency or duration to preclude the performance of all work activity. (R. at 20.) The ALJ found that treatment for Mullins's impairments had essentially been routine and conservative, and medical imaging and diagnostic testing showed generally mild to moderate abnormalities. (R. at 22.) As noted above, Mullins regularly had normal range of motion of all joints, normal strength, normal deep tendon reflexes and normal stance and gait, and he was repeatedly found to be in no acute distress. (R. at 387, 395, 399, 405, 411, 417, 452, 463, 496.) The ALJ noted that Mullins stopped working not due to his impairments, but due to a business-related layoff when the company where he worked closed. (R. at 22.) In addition, the ALJ considered Mullins's activities of daily living. (R. at 22-23.) Based on this, I find that the ALJ properly considered Mullins's complaints of pain.

I also find that substantial evidence exists to support the ALJ's finding that

-20-

Mullins does not suffer from a severe mental impairment. The record shows that Mullins complained of anxiety and depression to Dr. Zang in August 2012. (R. at 496.) There is no indication that Dr. Zang referred Mullins for additional psychotherapy treatment. In addition, the state agency psychologists found that Mullins did not suffer from a severe mental impairment. (R. at 75, 87.)

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the medical evidence. I further find that the evidence cited above provides substantial evidence supporting the ALJ's finding that Mullins's impairment does not meet or equal § 14.09. I also find that substantial evidence exists to support the ALJ's finding as to Mullins's residual functional capacity and his finding that Mullins was not disabled. An appropriate order and judgment will be entered.

ENTERED: August 26, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE